# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JENNIFER SMITH, | ] | |
| | ] | |
|     Plaintiff, | ] | |
| | ] | |
| v. | ] | 2:17-cv-01320-ACA |
| | ] | |
| CITY OF PELHAM, | ] | |
| | ] | |
|     Defendant. | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Defendant City of Pelham's motion for summary judgment (doc. 98) on all remaining claims asserted in Plaintiff Jennifer Smith's second amended complaint (doc. 59).

Ms. Smith was employed as the Administrative Assistant to the Chief of Police of the City of Pelham. In 2017, Chief Larry Palmer ordered an audit of Ms. Smith's time, the results of which showed that Ms. Smith was using her earned time to work for a secondary employer. When Mr. Palmer denied one of Ms. Smith's leave requests because she was planning to work for her other employer during that time, she filed an internal sex discrimination complaint, alleging that Mr. Palmer allowed male police officers to use their earned time in that manner. Shortly after she made that complaint, Mr. Palmer ordered a forensic examination of Ms. Smith's work computer with instructions to look for anything related to her

secondary job or other "inappropriate" behavior during work hours.   The examination revealed nude photographs of Ms. Smith and pornographic images. The next day, Mr. Palmer placed Ms. Smith on administrative leave and ultimately terminated her employment.

Ms. Smith sued the City, alleging that it (1) discriminated against her because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Count One"), and (2) retaliated against her because she opposed Mr. Palmer's discriminatory conduct, in violation of Title VII ("Count Two").   (Doc. 59).[1]   The City moved for summary judgment on both counts.   Because Ms. Smith fails to present sufficient evidence from which a reasonable jury could find that sex was a motivating factor in the City's decision to terminate Ms. Smith, the court **GRANTS** summary judgment in favor of the City and against Ms. Smith on Count One.   Likewise, because Ms. Smith fails to present sufficient evidence that the City's legitimate, nonretaliatory reasons for termination were pretext for retaliation, the court **GRANTS** summary judgment in favor of the City and against Ms. Smith on Count Two.

---

[1] The court previously granted the City's motion for partial summary judgment on Counts Three, Four, and Five.   (Doc. 72).   In addition, Ms. Smith has abandoned any hostile work environment claims.   (Doc. 114 at 3 n.1).

## I.  BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

From November 2003 until October 2015, Ms. Smith was employed by the City of Pelham as the Administrative Assistant to the Chief of Police, a role that involved performing office services such as budget preparation, scheduling, and records control.  (Doc. 115-1 at 8; Doc. 115-3 at 34; Doc. 115-17 at 54–56). Mr. Palmer became the Chief of Police on March 1, 2015.  (Doc. 115-1 at 14).

On May 27, 2015, Ms. Smith requested permission from Mr. Palmer to work part-time for Oak Mountain Amphitheater.  (Doc. 115-1 at 15; Doc. 115-15 at 2). The City allows employees to work secondary jobs with a supervisor's approval. (Doc. 115-10 at 26).  The City does not have a written policy prohibiting employees from using leave time to work a secondary job (doc. 100-3 at 17), and the parties dispute whether the City has an unwritten policy to that effect.  (Doc. 100-1 at 38; Doc. 100-3 at 17; Doc. 100-7 at 42; Doc. 111-2 at 53–66).  However, Ms. Smith assured Mr. Palmer that "all work done [would] be after [her] work hours assigned by the Pelham Police Department."  (Doc. 115-15 at 4).  Mr. Palmer approved Ms. Smith's request.  (*Id.* at 2).

In May or June 2015, Mr. Palmer became concerned about Ms. Smith's use of her time.  (Doc. 100-1 at 12; Doc. 100-8 at 9 ¶ 5).  Sometime in June or July 2015, he requested that Holly Coffman, another administrative employee, conduct an audit of Ms. Smith's time starting from March 1, 2015.[2]  (Doc. 111-18 at 9, 24; Doc. 115-7 at 15–16).  Around the same time, Mr. Palmer received at least one anonymous complaint about posts Ms. Smith had made on Facebook relating to her secondary job.[3]  (Doc. 100-1 at 52, 84–85).

On August 24, 2015, while Ms. Coffman was still conducting the audit of Ms. Smith's leave time, Ms. Smith asked to use comp time on September 17 and October 21, 2015.  (Doc. 115-11 at 8).  Mr. Palmer initially granted Ms. Smith's request, but when he learned that Ms. Smith was taking off September 17 to work an Oak Mountain Amphitheater concert, he retracted the approval.  (*Id*. at 8–9).  According to Ms. Smith, Mr. Palmer told her that because police officers could not use earned time to work off duty jobs, neither could she.  (*Id*. at 8–9).

---

[2] Ms. Smith disputes that Mr. Palmer requested the audit in June or July 2015, on the basis that some of the calendars on which Ms. Coffman wrote the audit results were printed in September 2015.  (Doc. 114 at 6 ¶ 23).  The court notes that some of the calendars were printed in July 2015. (Doc. 115-7 at 45–48).  But even if they had all been printed in September, the only reasonable inference that can be drawn from the print date is that the audit was completed in September, not that it was started in September.  (*See* Doc. 115-17 at 20).  Ms. Smith has not presented any evidence to dispute Mr. Palmer's testimony that in May or June 2015, he asked Ms. Coffman to audit Ms. Smith's use of time.

[3] Ms. Smith disputes the number of complaints that Mr. Palmer received, but she does not dispute that he received at least one.  (*See* Doc. 114 at 6 ¶ 30).

4

Several things happened in September 2015.  On September 2, 2015, Ms. Smith filed an internal sex discrimination complaint about the denial of her request for time off.  (Doc. 115-11 at 8).  She provided time sheets for four male officers who she alleged were allowed to use earned time to work off duty jobs.  (*Id.* at 13–22).  Ms. Smith also complained that Mr. Palmer had told her and several other female employees that they looked good in new uniforms that he had ordered for them.  (Doc. 115-1 at 67; *see also* Doc. 115-10 at 58).  Mr. Palmer learned of the complaint the next day, and agreed to cooperate fully with the investigation.  (Doc. 115-11 at 26).

At some point early in September—the date is unclear, but construed in Ms. Smith's favor, sometime on or after September 3—Ms. Coffman completed the audit of Ms. Smith's use of leave.  (Doc. 115-7 at 15–18; Doc. 111-1 at 40, 45; *see supra* at 4 n.3).  The audit revealed that Ms. Smith had used earned leave from the City to work for Oak Mountain Amphitheater on several occasions.  (Doc. 115-17 at 44–45; Doc. 111-15 at 93; *see also* Doc. 115-1 at 18).

On September 9, Ms. Smith notified Mr. Palmer that because of a family member's health issues, she might need to request leave on short notice, but that some of the time she might need would be during her regular 2:00–3:00 PM lunch hour.  (Doc. 111-8 at 64; Doc. 100 at 28–29; Doc. 100-1 at 30–31).  He responded that he had for some time requested that Ms. Smith and two other administrative

staff members coordinate their lunch breaks to occur between 11:00 AM and 2:00 PM.  (Doc. 111-8 at 63; *see also* Doc. 100-1 at 31).  He suggested that she take her lunch break at 1:00 PM and that she could request any leave she needed after her break.  (Doc. 111-8 at 63).  Mr. Palmer testified that he made this request to ensure that at least one member of the three administrative staff members was available to answer the phones during lunchtime.  (Doc. 100 at 30–31).  On September 10, Ms. Smith filed a complaint with Human Resources, describing the change in her lunch hour, disputing that Mr. Palmer had ever before asked her to change her schedule, and asserting that the change was in retaliation for her earlier complaint about him.  (*Id.* at 59–61; *see also* Doc. 100 at 29).

At some point between September 7 and 11, Mr. Palmer requested that Detective Patrick McGill conduct a forensic analysis of Ms. Smith's work computer, starting from May 2015.  (Doc. 115-6 at 12–13).  The City of Pelham has a Computer/Email & Internet Use Policy (the "Computer Use Policy") governing employees' use of their work computers.  (Doc. 115-18 at 53–55; *see* Doc. 108 at 3 ¶ 4; Doc. 114 at 3).  The Computer Use Policy provides that "[e]ach employee shall be responsible for using the City's computer systems for job-related purposes only" and permits disciplinary action up to and including termination for "misuse" of the computers and network.  (Doc. 115-18 at 53–55).  "Misuse" is defined to include "accessing, viewing, downloading, or any other method for retrieving non-city

related information including, but not limited to, entertainment sites or pornographic sites." (*Id.* at 53). The policy also prohibits the "[d]ownloading of files without the express consent of the department head." (*Id.* at 55). A Police Department Internal Memorandum sent to all employees prohibits the storage of "personal photos, music, documents or videos on City servers." (Doc. 115-17 at 36). The servers are for "police use only" and are not available for an employee's "storage of personal documents of any kind." (*Id.*). Mr. Palmer instructed Detective McGill to search for "anything related to [Ms. Smith's] job as far as secondary work or anything that was inappropriate during her work hours." (Doc. 115-6 at 13). There is no evidence indicating that Ms. Smith was aware of Detective McGill's forensic analysis of her computer.

On September 16, while Detective McGill was conducting the forensic examination, Mr. Palmer approved Ms. Smith's leave—the denial of which had been the basis for her internal sex discrimination complaint—and Ms. Smith withdrew her complaint. (Doc. 115-10 at 21). On or around September 23, Detective McGill reported to Mr. Palmer that he had discovered nude photographs of Ms. Smith, as well as pornography, on Ms. Smith's work computer. (Doc. 115-2 at 49). Detective McGill also discovered internet history showing that Ms. Smith had visited websites relating to her part-time job with Oak Mountain Amphitheater. (Doc. 115-17 at 84–85; *see also* Doc. 115-3 at 5).

On September 24, 2015, Mr. Palmer placed Ms. Smith on administrative leave with pay pending the final results of the investigation.  (Doc. 115-15 at 8; Doc. 115-2 at 51).  On October 1, 2015, Mr. Palmer called Ms. Smith for a meeting, at which he told Ms. Smith that the Police Department had located nude photographs of her on her work computer.  (Doc. 115-1 at 94; Doc. 115-10 at 37–38).  After offering Ms. Smith the opportunity to resign (doc. 115-1 at 94), Mr. Palmer terminated her employment (doc. 100-6 at 105–06).  The termination paperwork identified three grounds for dismissal: (1) conduct unbecoming an employee in the public service, in violation of City of Pelham Civil Service Law 6.2.c.; (2) violation of the City's Social Networking Policy; and (3) violation of the City's Computer Use Policy.  (Doc. 100-6 at 105).

Ms. Smith appealed the decision to the Personnel Board of the City of Pelham.  (Doc. 111-1 at 25–32).  The Personnel Board at the time was made up entirely of men (doc. 115-3 at 11–12), and the Board's Chairman, Bobby Hayes, had long been friends with Mr. Palmer (doc. 111-4 at 14).  Officers from the Police Department and City employees also attended the hearing.  (Doc. 111-4 at 14).  At one point in the hearing, Mr. Palmer indicated that he was offended by how Ms. Smith's attorney had spoken to him and called her "young lady."  (*Id.* at 76).

During the hearing, Mr. Palmer expressly conceded that he did not terminate Ms. Smith based on any violation of the Social Networking Policy.  (Doc. 111-4 at

98).  Instead, he testified that he terminated her based on the photographs found on her computer and for doing work for her secondary job on her work computer.  (*Id.* at 98–99).  After considering the evidence presented, the Personnel Board upheld the termination decision.  (Doc. 115-23 at 137).

The parties have also presented evidence about the termination of two male police officers, one for conduct unbecoming and one for misuse of a work computer. One male officer was forced to resign for conduct unbecoming after he sent photos of his genitals to members of the community.  (Doc 100-1 at 101–02).  At the time, Mr. Palmer was either the Deputy Chief or a Captain.  (*See id.*).  The City's former mayor testified that then-Chief Thomas and Mr. Palmer wanted to keep the police officer on the force.[4]  (*Id.*).  Only after the mayor threatened to terminate both of them did Chief Thomas give the police officer the choice to resign or be terminated. (*Id.*).  After the police officer resigned, the mayor asked for Chief Thomas's resignation, and appointed Mr. Palmer as the Chief.  (*Id.*).

On the second occasion, the City terminated an officer for misuse of a work computer.  (Doc. 115-3 at 14–15).  In that case, Detective McGill performed a forensic examination of the officer's work computer, discovering that the officer had hacked into the computer to look at pornographic sites.  (*Id.* at 14).  Mr. Palmer

---

[4] Mr. Palmer denies that he was opposed to terminating the police officer, or that he was even involved in the decision at all.  (Doc 100-1 at 101–02).

considered the employee's actions a "clear violation of the Internet policy," and the City terminated the officer, but it is not clear what role Mr. Palmer played in the termination.  (*Id.* at 14–15).

## II. DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318.  "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

In Title VII cases like this one, which lack any direct evidence of discrimination or retaliation, "[a] plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) sets out one test for whether circumstantial evidence suffices to survive summary judgment.

The *McDonnell Douglas* test requires the plaintiff to first make out a *prima facie* case of discrimination or retaliation, the requirements of which vary depending on the type of claim asserted.  *See Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361,

1363 (11th Cir. 2007); *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff can establish a prima facie case of discrimination, the burden shifts to the defendant to present evidence showing a legitimate, non-discriminatory (or non-retaliatory) reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244–45 (11th Cir. 2020). If the defendant can carry that burden, the plaintiff must present evidence from which a reasonable jury could find that the proffered reasons were pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Knox*, 957 F.3d at 1245. Notably, to survive the *McDonnell Douglas* test, a plaintiff must present sufficient evidence that every articulated reason given by the employer is both false and pretext for discrimination or retaliation. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993); *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308–09 (11th Cir. 2007).

But, at least with regard to a Title VII discrimination claim (as opposed to a retaliation claim), the *McDonnell Douglas* test is not the only method by which a plaintiff may survive summary judgment based on circumstantial evidence. Title VII expressly permits a plaintiff to establish liability by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see also Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1239–40 (11th Cir. 2016). In *Quigg*, the Eleventh Circuit explained that to survive summary judgment on a

mixed-motive discrimination claim under Title VII, the plaintiff must "offer[ ] evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action."  814 F.3d at 1239 (quotation marks omitted) (emphasis in original).

1. Count One (Sex Discrimination)

In Count One, Ms. Smith asserts that the City violated Title VII by terminating her based on her sex.  (Doc. 59 at 3 ¶ 8, 22 ¶ 110).  Although the City's initial brief in support of summary judgment focused exclusively on whether Ms. Smith could survive the *McDonnell Douglas* test (*see* doc. 108 at 29–36), Ms. Smith's response brief relies solely on the mixed-motive test (doc. 114 at 46–47).  Thus, to survive summary judgment, she needs to present evidence sufficient to convince a jury that: (1) the City took an adverse employment action against her, and (2) her sex was at least one motivating factor for the adverse employment action.  *Quigg*, 814 F.3d at 1232–33.

The parties do not dispute that Ms. Smith's termination was an adverse employment action for purposes of the sex discrimination claim.  Moreover, although Ms. Smith argues that various other actions constitute "adverse employment actions" for purposes of her retaliation claim, she does not make those arguments with respect to her discrimination claim.  Accordingly, for purposes of

the sex discrimination claim, the court considers Ms. Smith's termination to be the only adverse action, and will proceed directly to whether Ms. Smith has presented evidence from which a reasonable jury could find that at least one of Mr. Palmer's motivations in terminating her was her sex. *See Quigg*, 814 F.3d at 1235. Ms. Smith contends that she has carried that burden by presenting evidence about: (1) Mr. Palmer's comments concerning female administrative employees; (2) Mr. Palmer's alleged "double-standard" treatment of male and female employees, and; (3) bias demonstrated by the Personnel Board at the appeal hearing. (Doc. 114 at 46–47).

### a. *Comments about Female Administrative Employees*

Ms. Smith argues that she has presented evidence of gender bias because when the City briefly imposed a uniform requirement on administrative employees, Mr. Palmer wanted to "parade the three female admin employees to City Hall and 'show [them] off'" (doc. 115-1 at 67; doc. 111-15 at 145), and he told her: "If I had known you were going to look that good, I would have put you in uniform a long time ago" (doc. 115-10 at 58). The court notes that Ms. Smith has not pointed to any evidence that Mr. Palmer ever *said* he wanted to parade female employees around to show them off; instead, she quotes her own characterization of his actions from the internal complaint she filed. (*See* Doc. 114 at 31 ¶ 32, 46; *see also* Doc. 111-15 at 145).

But even if Mr. Palmer had made both of those comments, they would establish only gender bias.  The existence of gender bias, standing alone, does not establish that a protected characteristic *motivated* an employment action.  *See Quigg*, 814 F.3d at 1232–33.  Ms. Smith does not argue, nor does the evidence indicate, that Mr. Palmer's comments about the female staff's looks had anything to do with any employment decisions.  *Cf Quigg*, 814 F.3d at 1241–42 (noting that statements showing gender bias occurred during conversations about the relevant employment decision and in close temporal proximity to the date of that decision).  Here, Mr. Palmer's alleged comments were unrelated to any employment decision.  They may show gender bias on Mr. Palmer's part, but they do not show that gender bias affected his "decisional process."  *See Quigg*, 814 F.3d at 1241.

### b.   *"Double-Standard" Treatment of Male and Female Employees*

Second, Ms. Smith argues that Mr. Palmer used a "double standard" in allowing male police officers, but not her, to use leave to work secondary jobs.  (Doc. 114 at 46–47).

The court notes at the outset that Ms. Smith relies on a partial quote to establish that Mr. Palmer allowed only male police officers to use leave to work secondary jobs.  (*See id.*).  This quote comes from notes taken by the Police Department's human resources director during her interview of Mr. Palmer based on Ms. Smith's internal discrimination complaint.  (Doc. 100-3 at 17–18).  The

human resources director asked him whether "a sworn officer [can] request vacation time for any other outside employment that does not require him/her to be in 'uniform[.]'" (Doc. 111-2 at 64).  Mr. Palmer responded: "Not a problem," as long as it was not "excessive" and with the understanding that the officers were "subject to recall." (*Id.*; Doc. 100-3 at 17–18).  This evidence may show that Mr. Palmer, contrary to his contention, used a different policy for officers' use of leave versus non-officers' uses of leave.  It does not, however, show any gender bias; to the contrary, the question that Mr. Palmer was answering expressly acknowledged that police officers might be male or female, and female officers would be subject to the same rules as male officers.[5]  This evidence may show different treatment of police officers than administrative staff, but it does not show gender bias.

In any event, Ms. Smith has not presented evidence that Mr. Palmer knowingly allowed any Police Department employees to take leave to work a secondary job.  She seems to argue that seven male police officers worked secondary jobs while on leave.  (Doc. 114 at 9 ¶ 46).  For three of those officers, Ms. Smith has not presented any evidence that they worked a secondary job at the same time they were using leave; instead, she asserts generally that they worked part-time at the same secondary employer as her.  (*See id.*).  No reasonable jury could infer that

---

[5] Ms. Smith has not argued or presented evidence about the number of female police officers working for the City.

because the officers had part time jobs, they must have used leave to work those jobs during their scheduled primary job hours.

Ms. Smith does expressly assert that four of the officers used leave to work secondary jobs. (Doc. 114 at 9 ¶ 46). She presents evidence that on September 1, 2015, three of those officers worked from 2:00 PM to 10:00 PM. (Doc. 111-1 at 21; *see also* Doc. 100-10 at 8 (defining "RP" as "regular pay")). A sign-in sheet from a concert at Oak Mountain Amphitheater shows that, during that shift, one of those officers signed in from 12:00 PM to 4:00 PM, one signed in from 5:30 PM to 12:00 AM, and one signed in from 8:00 PM to 12:00 AM. (Doc. 111-7 at 87). But none of these officers took leave before signing in at Oak Mountain Amphitheater, so no reasonable jury could find that Mr. Palmer permitted these officers to use leave to work a secondary job.

The last officer that Ms. Smith asserts was allowed to use leave to work a secondary job is Davy Lott. (Doc. 114 at 9 ¶ 46). Mr. Lott had the City's approval to work a secondary job in real estate. (Doc. 111-11 at 32). On September 1, 2015, Mr. Lott was scheduled to work a shift from 6:00 A.M. to 2:00 P.M. (*See* Doc. 111-1 at 21; Doc. 100-10 at 3 ¶ 6). He took four hours of vacation leave during that shift, although it is unclear whether he took it at the beginning, middle, or end of the shift. (Doc. 111-1 at 21). At 6:15 P.M. that evening—hours after the end of his scheduled shift—he signed in at the Oak Mountain Amphitheater. (Doc. 111-7 at 87).

Ms. Smith contends that "presumably" Mr. Lott used his four hours of vacation leave to work his real estate job, followed by a second part-time job later in the evening.  (Doc. 114 at 9 ¶ 46).

That presumption is entirely speculative.  Ms. Smith has not presented any evidence of what Mr. Lott did during his four hours of vacation time, nor has she presented any evidence that he did any real estate work that day, much less during the four hours he took off.  Even if he had worked his real estate job during those four hours, Ms. Smith has not presented any evidence that Mr. Palmer approved the leave request knowing that Mr. Lott was planning to work a secondary job during his regularly scheduled shift.  In short, Ms. Smith has not presented any evidence that male employees were subject to a different leave policy than she was.

Ms. Smith makes one more argument about Mr. Palmer's alleged "double standard."  Specifically, she asserts that Mr. Palmer opposed the termination for "conduct unbecoming" of a male police officer who sent photos of his genitals to members of the community, but fired her for "conduct unbecoming" after discovering nude photos and pornography on her work computer.  (Doc. 114 at 47; Doc. 100-2 at 100–01).  There is very little evidence in the record about the situation with the male police officer.  Ms. Smith points out that then-Chief Thomas and Mr. Palmer wanted to keep the police officer on the force, but offers no information about any decision-making authority Mr. Palmer had with respect to that officer or

details about why he might have supported keeping the officer on the force. (*See* Doc. 100-2 at 100–01). Ms. Smith has not presented sufficient evidence about the situation with that officer for a reasonable jury to find that gender bias motivated Mr. Palmer's decision about how to discipline her violations of City policy once he became the Chief of Police.

In any event, Ms. Smith was terminated not only for "conduct unbecoming," but for violating the City's Computer Policy. (Doc. 111-1 at 25). The evidence shows that the City terminated a male police officer who violated the Computer Policy by hacking into the computer system and accessing pornography. (Doc. 115-3 at 15). According to Mr. Palmer, the employee's conduct was a "clear violation of the Internet policy," resulting in the City's termination of his employment. (*Id.*).

Given the dearth of information about the officer who sent pictures of his genitals to members of the community, combined with the evidence that the City terminated a male employee for conduct similar to Ms. Smith's, Ms. Smith has not shown any evidence from which a reasonable jury could find a double standard in treatment between herself and male Police Department employees.

   c.  *The Personnel Board*

Ms. Smith argues that the Personnel Board's actions during her appeal hearing show that her sex was a factor motiving her termination. (Doc. 114 at 47). She

refs to both the behavior of the members of the Board as well as Mr. Palmer's behavior during the hearing.  (*Id.* at 46; *see also id*. at 33–36 ¶¶ 77–84).

First, although Ms. Smith asserts that the Board hearing was one-sided, she concedes that Mr. Palmer, not the Board, was the final decisionmaker.  (Doc. 114 at 45 ("Palmer recommended and approved his own decision to fire [Ms. Smith]. . . .")); *see Quinn v. Monroe Cty.*, 330 F.3d 1320, 1326–28 (11th Cir. 2003) (holding, in the context of a 42 U.S.C. § 1983 employment discrimination claim, that the final decisionmaker is the person with authority to effectuate a termination, even if an employee has the option to pursue an appeal).  She has not explained how the behavior of members of the Board, who reviewed Mr. Palmer's decision only after he had already made and effectuated it, could establish that Mr. Palmer was motivated by gender bias when he made the decision.

Ms. Smith also points to Mr. Palmer's behavior at the hearing, highlighting Mr. Palmer's reference to Ms. Smith's female attorney as a "young lady" and his remark that the attorney owed him an apology.  (Doc. 111-4 at 76; Doc. 115-3 at 26).  Even assuming that Mr. Palmer's behavior at the appeal hearing showed gender bias, Ms. Smith has not provided any link between the alleged gender bias and Mr. Palmer's decisionmaking process.

Ms. Smith also argues that Mr. Palmer's longstanding friendship with a Board member shows bias (doc. 114 at 33 ¶ 78), but no reasonable jury could find the

existence of gender bias based only on a lengthy friendship.  Finally, Ms. Smith alleges that Mr. Palmer brought a large number of officers to the hearing to intimidate her.  (*Id.* at 34 ¶ 82).  Although there is evidence that police officers attended the public hearing, Ms. Smith has not pointed to any evidence that Mr. Palmer asked or ordered them to attend.  (*See id.*).  Even if she had presented such evidence, she has not presented evidence that the alleged attempt to intimidate her was related to her sex, instead of some personal antipathy.

Ms. Smith has not presented sufficient evidence for a reasonable jury to find that her sex was a motivating factor for the termination of her employment. Accordingly, the court **GRANTS** the motion for summary judgment on Count One.

## 2. Count Two (Retaliation)

In Count Two, Ms. Smith alleges that the City retaliated against her for submitting her internal sex discrimination complaint by altering her scheduled lunch hour, conducting an unwarranted internal investigation, conducting an improper search of her office, suspending her, and terminating her employment.  (Doc. 59 at 23  ¶ 114, 38–39  ¶¶ 197–200).   Title VII's anti-retaliation provision prohibits employers from retaliating against an employee for opposing an employment practice made unlawful by Title VII.  42 U.S.C. § 2000e–3(a).  The *McDonnell Douglas* framework "applies in cases of retaliation relying on circumstantial evidence."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

Under that framework, Ms. Smith must first make a *prima facie* showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action, and; (3) there was a causal connection between the protected activity and the materially adverse action. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). Once a plaintiff makes the *prima facie* showing, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for its action. *Brown*, 597 F.3d at 1181–82. If the employer articulates a legitimate, nonretaliatory reason for its actions, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Tex. Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 255–56 (1981).

### a. *Prima Facie* Case

The City does not dispute that Ms. Smith's filing of an internal complaint constitutes a statutorily protected activity. (Doc. 108 at 39–40). The parties do, however, dispute what actions were materially adverse and whether there was a causal connection because Ms. Smith's protected activity and the adverse actions.

### i. Adverse Actions

For purposes of a Title VII retaliation claim, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge

of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted).  The action must be "material"; Title VII does not protect against "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.

Ms. Smith alleges that the City's following actions constitute "materially adverse" actions: (1) the alteration of her lunch schedule; (2) alleged intimidation tactics by Mr. Palmer; (3) becoming the subject of internal investigation; (4) suspension; (5) termination, and; (6) "having to endure conduct tantamount to shaming and mockery" during the Personnel Board hearing.  (Doc. 114 at 38–39). The City, for its part, asserts that the only materially adverse action was Ms. Smith's termination.  (Doc. 108 at 39; Doc. 120 at 7–9).  The court will therefore address only the other five alleged adverse actions.

It is unclear whether the alteration of Ms. Smith's lunch schedule by an hour is a materially adverse action for purposes of a Title VII retaliation claim.  (*See* Doc. 115-17 at 15).  Ms. Smith's email notifying Mr. Palmer that she might need to request time off on short notice indicated that she might need that lunch hour to deal with child care issues.  (Doc. 111-8 at 64).  The Supreme Court has stated in dicta that "[a] schedule change in an employee's work schedule may make little difference

22

to many workers, but may matter enormously to a young mother with school-age children." *Burlington*, 548 U.S. at 69. Given that Ms. Smith's email to Mr. Palmer indicated only that she might need leave to deal with child care issues, not that she actually did need the leave for child care purposes, the court doubts that changing Ms. Smith's lunch hour is material enough to qualify as a materially adverse action. For ease of analysis, however, the court will assume that it was.

Second, Ms. Smith contends that Mr. Palmer engaged in "intimidation tactics" by placing both hands on Ms. Smith's desk and leaning forward when speaking to her "every now and then." (*See* Doc. 115-1 at 34). Ms. Smith has offered no evidence that Mr. Palmer's behavior rose above a lack of good manners, and the court cannot find that a supervisor engaging in that conduct would deter a reasonable person from making a charge of discrimination.

Third, the City's decision to conduct an internal investigation does not constitute a materially adverse action. Ms. Smith was unaware that she was the subject of an internal investigation or that her computer had been forensically examined until the day of her termination. (Doc. 115-10 at 38). A reasonable worker could not be dissuaded from making a charge of discrimination due to an investigation of which she had no knowledge.[6] *See Burlington*, 548 U.S. at 68–69.

---

[6] The court does not find persuasive Ms. Smith's reliance on a district court case to establish that becoming the subject of an internal investigation was an adverse action. For one thing, district court cases are not binding authority. Even if they were, the case on which she relies

Fourth, it is unclear whether being placed on administrative leave with pay for one week might constitute a materially adverse action. Although the Eleventh Circuit has held that a suspension *without* pay is a materially adverse action, *see Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010), it has not addressed the import of a suspension with pay. The Seventh Circuit has held that a suspension with pay is not a materially adverse action for purposes of a retaliation claim, but it did so based on caselaw addressing discrimination claims and the pre-*Burlington* standard for retaliation claims. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786–87 (7th Cir.2007). Again, for the sake of simplicity, the court will assume that a one-week suspension with pay "well might . . . dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. 68.

Finally, Ms. Smith has not presented evidence sufficient to show that "having to endure conduct tantamount to shaming and mockery" during the Personnel Board hearing amounts to a materially adverse action. By the time of the Personnel Board hearing, Mr. Palmer had already terminated Ms. Smith; an employee could not have been dissuaded from making a charge of discrimination against a supervisor based

---

is distinguishable. *See Smart v. City of Miami Beach*, 1 F. Supp. 3d 1350, 1353–54 (S.D. Fla. 2014) (stating that the employee knew of the computer's removal as part of the investigation, the employee's personal property located on her desk also had been removed, and employee had been directed not to contact police regarding the incident).

on conduct that occurred after termination. *See Burlington*, 548 U.S. at 68–69 (holding that the test for materiality is "objective"). While Ms. Smith expresses disapproval as to how the hearing was conducted, she has not shown any injury or harm. *Burlington*, 548 U.S. at 67. Accordingly, the conduct displayed at Board hearing was not a "materially adverse action."

In summary, Ms. Smith's termination was clearly a materially adverse action, and the court will assume that the change to her lunch hours and suspension with pay constitute materially adverse actions, but no reasonable jury could find that Mr. Palmer's "intimidation tactics," the internal investigation, or the "shaming and mockery" during the Personnel Board hearing were materially adverse actions.

### ii. Causal Connection

Next, Ms. Smith must show a causal connection between her protected activity and the three materially adverse actions (changing her lunch hours, suspending her with pay, and termination). *See Quigg*, 814 F.3d at 1244. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse . . . action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Ms. Smith filed her internal complaint on September 2, had her lunch hours changed on September 9, was placed on leave on September 24, and was terminated on October 1. (Doc. 115-11 at 7–22; Doc. 115-2 at 51; Doc. 111-8 at 63). This is

close enough in time for a reasonable jury to conclude that retaliation was the cause of those actions. *See Thomas*, 506 F.3d at 1364.  Ms. Smith has carried her burden of presenting sufficient evidence to make out a *prima facie* case of retaliation. Accordingly, the burden shifts to the City to articulate a legitimate, nonretaliatory reason for the adverse actions. *See Brown*, 597 F.3d at 1181–82.

### b.  Legitimate, Nonretaliatory Reasons and Pretext

The City contends that Mr. Palmer changed Ms. Smith's lunch schedule to ensure that at least one administrative staff member was available "to respond to phone calls, citizen requests, or other issues." (Doc. 108 at 18 ¶¶ 49–50). It asserts that Mr. Palmer suspended Ms. Smith with pay because of the existence of nude and pornographic images on her computer (*id.* at 23 ¶ 62), and terminated Ms. Smith based on: (1) her use of her earned City time to work another job; (2) the posting of suggestive images on Facebook in violation of the Social Networking Policy, and; (3) the presence of nude, graphic photographs of Ms. Smith and others stored on her work computer. (*Id.* at 38).  Because the City has articulated "clear and reasonably specific" nonretaliatory bases for its action, the City has satisfied its "exceedingly light" burden. *Burdine*, 450 U.S. at 254–55 (noting that an employer "need not persuade the court that it was actually motivated by the proffered reasons").

The burden therefore shifts to Ms. Smith to present evidence sufficient for a jury to find that the City's reasons were pretext for retaliation. To do so, Ms. Smith

must present evidence that could convince a reasonable jury that every one of the proffered reasons was false and that the real reason was retaliation. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993); *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308–09 (11th Cir. 2007).

With respect to the change in her lunch schedule, the City presented evidence that the change was necessary to provide full coverage for telephone calls from the public. (Doc. 100 at 30–31). The only evidence of falsity that Ms. Smith has presented is the temporal proximity of her discrimination complaint to the schedule change. (*See* Doc. 114 at 41). No reasonable jury could find, based solely on the timing, that the City's articulated reason is false, or that the City's true reason for the change was retaliation. Ms. Smith has not carried her burden of presented evidence from which a reasonable jury could find that the City retaliated against her by changing her lunch schedule.

Next, the City asserts that it suspended Ms. Smith in light of the discovery of the nude photographs and pornography on her work computer. (Doc. 108 at 23 ¶ 62). Mr. Palmer learned about the images on Ms. Smith's computer on or around September 23 (doc. 115-2 at 49), and he suspended her the next day (doc. 115-15 at 8; doc. 115-2 at 51). To show that the City's articulated reason is pretextual, Ms. Smith points to the fact that Mr. Palmer suspended her twenty-one days after he learned about her internal complaint. (Doc. 114 at 41; *see also id.* at 11). But

although the timing is enough to establish a *prima facie* case, at the last step of the *McDonnell Douglas* test, Ms. Smith's burden is higher: she must present evidence from which a jury could find that Mr. Palmer did not actually suspend her based on the discovery of the materials on her computer, and that he actually suspended her in retaliation for her filing of the internal complaint.  *See Crawford*, 482 F.3d at 1308–09.  In this case, the timing alone is not sufficient to carry that burden in light of the evidence about when Mr. Palmer learned of the images and when he suspended her.

Finally, the City contends that Mr. Palmer terminated Ms. Smith for a number of reasons, including: (1)  her use of her earned City time to work another job; (2) the posting of suggestive images on Facebook in violation of the Social Networking Policy, and; (3) the presence of nude, graphic photographs of Ms. Smith and others stored on her work computer.  (Doc. 108 at 38).

Ms. Smith has presented evidence that the City's second articulated reason— the violation of the Social Networking Policy—is false because Mr. Palmer expressly denied that Ms. Smith's Facebook posts were the reason for her termination.  (*See* Doc. 114 at 45; Doc. 111-4 at 98–99).  However, she has not presented evidence that the other two proffered reasons—use of earned time to work a secondary job and violation of the Computer Use Policy—are false.  *See Crawford*, 482 F.3d at 1308 ("If the employer proffers more than one legitimate,

nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment.").

With respect to Ms. Smith's use of leave time to work a secondary job, she admits that she did so. (*See* Doc. 108 at 11 ¶ 29; Doc. 114 at 6). She argues, however, that Mr. Palmer permitted male employees to use leave in that manner, while not allowing her to do so. (Doc. 114 at 46–47). But as discussed above, she has not presented any evidence of a male employee whom Mr. Palmer knowingly allowed to use leave to work a secondary job. *See supra* at 16–17. Accordingly, she has not carried her burden of presenting evidence of falsity.

Likewise, Ms. Smith admits that she had nude pictures and pornography on her computer, although she asserts that she did not intentionally put those images there. (*See* Doc. 108 at 21 ¶¶ 59, 61; Doc. 114 at 10). She does not argue that the existence of those images on her computer was not a violation of the Computer Use Policy. (*See* Doc. 114 at 43). Nor could she. (*See* Doc. 111-4 at 38; Doc. 111-5 at 144). The Computer Use Policy provides that "misuse" of a work computer includes "accessing, viewing, downloading, or any other method for retrieving non-city related information including, but not limited to, entertainment sites or pornographic sites. (Doc. 115-7 at 53). Although Ms. Smith did not use her computer to access, view, download, or otherwise retrieve a "pornographic site," no reasonable jury could find that placing pornographic images on the work computer would not violate

the rule.[7]  Moreover, the evidence shows that the City has also terminated a male employee for accessing pornography on a work computer.  (Doc. 115-3 at 14–15).

Because Ms. Smith has not presented evidence that two of the reasons for her termination were false, her retaliation claim cannot survive summary judgment.  But even if she had shown that all three reasons were false, she has not presented evidence that the true motive for her termination was retaliation.  She asserts that the initiation of the investigations into her timekeeping and her use of the computer shows retaliatory motive.  (Doc. 114 at 43–44).  But again, she relies entirely on the timing, despite the City's evidence that Mr. Palmer had been investigating her timekeeping for months and had received at least one complaint about her Facebook posts before he ordered the forensic examination of her work computer.  (Doc. 115-7 at 15; Doc. 115-17 at 24, 45–48).

The evidence is insufficient to show that all of the City's articulated reasons for termination were false and that the real reason for the adverse actions was retaliation.  Accordingly, the court **GRANTS** the City's motion for summary judgment on Count Two.

---

[7] To the extent that Ms. Smith contends that only an expert could view the images, who could view the material is immaterial.  The Computer Use Policy forbids misuse of a work computer regardless of who can access any files on the computer.  (Doc. 115-18 at 53).  In any event, Ms. Smith's assertion that "only an expert" could view the images is incorrect.  According to Detective McGill, because the file was on the City network, "anybody [could] pull that file." (Doc. 111-5 at 11).

## IV.   CONCLUSION

The court **GRANTS** the City of Pelham's motion for summary judgment.  The

court **WILL ENTER SUMMARY JUDGMENT** in favor of the City of Pelham

and against Ms. Smith on Counts One and Two.

The court will enter a separate final judgment in accordance with this opinion.

**DONE** and **ORDERED** this July 28, 2020.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE